TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00543-CV







Cindy Hebert and Shea Hebert, Appellants




v.




Donovan Neal Kokel, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. D-1-FM-02-005680, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING







M E M O R A N D U M O P I N I O N



 Cindy Hebert and Shea Hebert appeal the district court's judgment, after a bench trial,
appointing Donovan Neal Kokel as a possessory conservator of T.D.B., a child who was born during
his marriage to Cindy Hebert but is not his child. In two points of error, the Heberts contend that
the district court deprived them of their constitutional rights by continuing contact between T.D.B.
and Kokel, and erred in imposing a geographic restriction limiting the child's residence to Travis
County and contiguous counties for a period of one year. For the reasons that follow, we affirm the
judgment of the district court.


BACKGROUND

 Donovan Kokel and Cindy Hebert began dating as teenagers in November 1989. 
They married in 1994. In the spring of 2001, Cindy had an affair with Shea Hebert, an employee at
Kokel's wrecker company. In March 2001, Cindy and Kokel separated.

 On September 10, 2001, Kokel served Cindy with divorce papers. Over the next few
days, Cindy and Kokel reunited, and Kokel learned that Cindy was pregnant. At trial, Kokel testified
that Cindy told him that she needed financial assistance, that she wanted to work out their problems,
that she wanted Kokel to be the father figure in her son's life, and that Shea Hebert was now
"involved" with another person. At a family event, Kokel and Cindy announced that they were
reuniting and that Kokel was "going to be [T.D.B.'s] dad." Kokel was present at and participated
in the birth of T.D.B. on January 1, 2002. For approximately two years, Kokel, Cindy, and T.D.B.
lived together as a family unit, and T.D.B. knew only Kokel as his father.

 Because Cindy had signed up for food stamps during the separation, in 2002, the
attorney general's office instituted a paternity action against Shea Hebert. By letter, Cindy advised
the State,


After consulting with my attorney and on his advice I am writing you this letter to
inform you that there is a possibility, somewhat unlikely, but still a possibility that
my husband of 8 years Donovan Neal Kokel is the father of this child. It was brought
to my attention that because I was married during the conception and birth of this
child that legally this child is considered his. We were separated for a brief period,
but have come to reconcile the relationship.



Kokel had believed he was unable to conceive a child. The results of paternity testing excluded
Kokel as the father. On January 30, 2003, the court rendered a default order finding Shea Hebert to
be the child's biological father, appointing him as T.D.B.'s possessory conservator, and granting to
him visitation rights. Until the order, Shea Hebert had never seen or had contact with T.D.B., and
he did not exercise his visitation rights for the first twenty-three months of T.D.B.'s life.

 At the end of 2003, Shea Hebert began exercising his visitation rights and, at the same
time, rekindled his relationship with Cindy. The relationship between Kokel and Cindy began to
deteriorate. On January 30, 2003, Cindy and Kokel separated, and Cindy, taking the child, moved
in with Shea Hebert. Kokel had frequent visitation with T.D.B. until March 2004 when Cindy
discontinued Kokel's visits. 

 Kokel filed suit in March 2004, seeking appointment as a possessory conservator of
T.D.B. with visitation rights. Kokel and Cindy were divorced in a separate suit, and Cindy married
Shea Hebert in July 2004. The district court issued temporary orders in this case appointing a
guardian ad litem, appointing Kokel as a possessory conservator of the child, and directing that
regular visitation resume.

 After a bench trial, the district court ruled in favor of Kokel, finding that it was in the
best interest of T.D.B. to appoint Kokel as a possessory conservator, and granted Kokel, the only
person T.D.B. had known as his father for the first two years of his life, visitation rights. The court
also ordered a one-year restriction limiting the child's residence to Travis County and contiguous
counties. The district court issued, inter alia, the following findings of fact:


4. Petitioner has been involved consistently and substantially in the child's life
since his birth.


5. For approximately the first year and one-half of the child's life, Petitioner alone
was in the role of father of the child, was held out as such by Petitioner and the
child's mother, and provided support to the child that was not provided by the
biological father.


 6. A strong parent-child bond exists between the child and Petitioner.


 7. Severing the relationship and bond that exists between the child and Petitioner
would entail a substantial risk of harm to the child's emotional well-being.


 8. Appointing Petitioner as the non-parent permanent possessory conservator of the
child is appropriate and such appointment would be in the best interest of the
child.


 9. The child will benefit from continued visitation and interaction with Petitioner
on a regular and on-going basis and the same is in the best interest of the child.


10. The parties and the child would benefit from family therapy and from the
continuation of Mr. Kokel's individual counseling, and the same is necessary
and appropriate under the circumstances and is in the best interest of the child. 



This appeal followed.


ANALYSIS

 As the biological parents of T.D.B., Cindy and Shea Hebert argue that the district
court violated their constitutional rights as parents when it overrode their decision to discontinue
contact between T.D.B. and Kokel. Citing Troxel v. Granville, 530 U.S. 57 (2000), (1) they contend
that the district court infringed on their right to control the care and custody of their child when it
appointed Kokel as a possessory conservator and allowed visitation.

 The Heberts do not dispute that the Texas Family Code expressly grants standing to
Kokel to bring a suit affecting the parent-child relationship. See Tex. Fam. Code Ann.
§ 102.003(a)(9) (West Supp. 2005), § 156.002 (West 2002). Under section 102.003(a)(9), an
original suit affecting the parent-child relationship may be filed by a person, other than a foster
parent, who has had actual care, control, and possession of the child for at least six months ending
not more than 90 days preceding the date of the filing of the petition. Id. § 102.003(a)(9). In its
findings of fact, the district court found that Kokel "had actual care, control and possession of the
child for at least six months ending not more than 90 days preceding the date of the filing of
Petitioner's Petition to Modify Parent-Child Relationship." The Heberts do not challenge Kokel's
standing and, in any event, we conclude that, based upon the record, Kokel established standing.

 Moreover, the Heberts neither pleaded nor raised in the district court the point of error
now raised for the first time on appeal. A constitutional attack must be raised in the trial court. 
Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993). A party who participates in a proceeding
without challenging its constitutionality may waive his right to question that proceeding. Mercer
v. Phillips Natural Gas Co., 746 S.W.2d 933, 936 (Tex. App.--Austin 1988, writ denied). The
Heberts neither challenged the proceeding nor the statute authorizing the suit brought by Kokel. See
United States Reading Lab v. Brockette, 551 S.W.2d 531, 532-33 (Tex. Civ. App.--Austin 1977,
no writ). For this reason, they have waived the issue and we overrule their point of error.

 In the final analysis, however, and in the interest of justice, we nevertheless address
the best interest of the child, which is always the primary consideration of the court in determining
questions of conservatorship and access to the child. Tex. Fam. Code Ann. § 153.002 (West 2002). 
We turn, then, to the question before the court at trial: the best interest of the child.

 A trial court has wide discretion in determining the best interest of a child in family
law matters such as custody, visitation, and possession. Gillespie v. Gillespie, 644 S.W.2d 449, 451
(Tex. 1982); G.K. v. K.A., 936 S.W.2d 70, 72 (Tex. App.--Austin 1996, writ denied). We will
reverse a trial court's order only if it appears from the entire record that the trial court abused its
discretion, meaning it acted unreasonably, arbitrarily, or without reference to any guiding principles. 
G.K., 936 S.W.2d at 72. There is no abuse of discretion if the decision is supported by sufficient,
competent evidence. Gillespie, 644 S.W.2d at 451. That a trial court decides an issue differently
than would an appellate court does not demonstrate an abuse of discretion; a trial court is in a better
position than an appellate court to evaluate testimony and evidence and determine the child's best
interest. Wright v. Wright, 867 S.W.2d 807, 816 (Tex. App.--El Paso 1993, writ denied). The trial
court, as fact-finder, resolves conflicts in the evidence and determines the weight and credibility to
give to witness testimony. Schneider v. Schneider, 5 S.W.3d 925, 931 (Tex. App.--Austin 1999,
no pet.). A fact-finder's decision on conflicts in the evidence is generally viewed as conclusive. Id.

 The record here contains ample evidence to support the district court's findings of
fact as well as its conclusion that appointment of Kokel as a possessory conservator is in T.D.B.'s
best interest. Although there is evidence to support the Heberts' argument against visitation, there
is also evidence favoring Kokel's continued access to T.D.B. The Heberts have not shown that the
district court abused its discretion in allowing Kokel to have regular visitation with T.D.B. 
Moreover, the Heberts have not challenged any of the district court's findings of fact.

 The bench trial occurred over three days. Eighteen witnesses testified, including
Kokel, the Heberts, Kokel's parents, Cindy's father, and the guardian ad litem. Kokel testified that
he was the general manager of Denver Towing, a family wrecker-service business. He explained that
he learned that his wife was having an affair with his employee, Shea Hebert. When he served Cindy
with divorce papers, they reconciled, and she told him that she was pregnant. He testified that she
told him that she trusted him, needed him financially, and wanted him to be the father figure in
T.D.B.'s life. When they decided to work out their problems and raise the child together, Kokel
made the announcement at Cindy's father's birthday celebration that, "I am going to be [T.D.B.]'s
dad." Kokel described how he was present at the child's birth and participated in it; saw T.D.B.
every day, even when he was separated, until Cindy later cut off visitation; cared for T.D.B. every
day because his business was close to T.D.B.'s home and allowed T.D.B. to spend time with him at
work; and fed him lunch and dinner, gave him baths, and put him to bed:


Seventy-five percent of the day every day [T.D.B.] spent with me. . . . I own my own
business, that's part--I'm one of the owners, general manager. I run the business,
so I am--you know, I pretty much have free reign as far as what I want to do. I take
[T.D.B.] to work with me all the time. He would be at the shop. He--you know, he
just--just as much a part of my life every day as getting up, walking or breathing. 
You know, he was there every day. I would give him--eat lunch with him, take him
to lunch, give him his baths, put him to bed, feed him dinner. You know, I think I
am probably the only person he would ever eat peas or spinach for.


Kokel also testified that he supported T.D.B. financially, that he always treated T.D.B. as his own
child, and that Cindy encouraged his involvement in the child's life. Other witnesses testified to
Kokel's character and their observations concerning his relationship with T.D.B.

 The court-appointed guardian ad litem testified that discontinuing visitation between
Kokel and T.D.B. would be harmful to the child and would impair his relationship not only with
Kokel, but with Kokel's parents, grandfather, and others in the seemingly close-knit family who
relate to T.D.B. through Kokel. He described the strong parent-child bond he observed existing
between T.D.B. and Kokel. The guardian ad litem expressed an opinion as to which of the parties
had demonstrated more stability:


It appears to me that Mr. Kokel is the more stable of the two parties. And I'll base
that on a couple of reasons. We've got Shea, Mr. Hebert, who, of course, loves his
child, loves his wife. While she is pregnant, disappears, doesn't come back for two
years later, or year and a half or so later. He's got three other children, which I don't
know anything about because I wasn't allowed to investigate that. I have heard and
I understand it came in a previous hearing that Mr. Hebert has a criminal history. 
Ms. Hebert goes back and forth, you know. Shea then it's back to Mr. Kokel, then
back to Shea.


Whereas, we've got Mr. Kokel, who is on a sizeable piece of land. He's got a very
stable family and I think that we also have to remember that the kind of family that
Mr. Kokel has is kind of what I think of as a subculture in our society. It's a--a
wrecker subculture, that is how I put it like that. His father was a wrecker driver and
his father before him was a wrecker driver. And they are kind of a different kind of
people there. They kind of have a kind of mentality, wrecker-driver mentality. And
they kind of hang together. . . . [H]is family is stable and I think they love one
another. They are going to be there. They are going to be on that piece of property
right there in north Austin. I don't think they're going anywhere.


Whereas, I can't say that about Ms. Hebert. I cannot say that about Mr. Hebert.



 Shea Hebert testified that Kokel is a bad influence on T.D.B.'s life and that he should
not be around the child. He testified that Kokel is violent and that he had seen him beat a dog for
chasing a cat. Hebert stated that when T.D.B. returned from his visits with Kokel he acted
differently and had a "real bad temper." Hebert has seen Kokel "holler and scream" at children. 
Hebert explained that he has three other children with whom he exercises visitation. As the
biological father, Hebert stated that he and his wife "should know what is best for our son, should
be able to provide the best for our son, and be able to keep him out of any kind of harm or danger
without having any third-party interference or even the Court's interfering in our life."

 On cross-examination, Hebert admitted that he did not exercise visitation or have
contact with T.D.B. during the first year and nine months of T.D.B.'s life, and that he "wasn't as
willing to accept responsibility back then as I was when I came back and am now." Hebert testified
that, when Kokel and Cindy separated for the second time in January 2004, he encouraged Kokel to
continue visitation with T.D.B. He recognized that there was a bond between T.D.B. and Kokel,
"but not one that was strong enough that couldn't be changed." Hebert believed that he cooperated
with the guardian ad litem's investigation, but acknowledged that he followed his attorney's advice
and refused to submit to drug testing. Cindy Hebert testified concerning expenses and attorney's
fees.

 Steve Boyd, Cindy's father, also testified. He stated that he had known Kokel for
most of Kokel's life and had lived close to Kokel and Cindy when they were married. He described
the birthday party during which he learned he was going to be a grandfather. Although he had
moved out of town, he remained in contact with Kokel and his daughter and had frequent contact
with T.D.B., his only grandchild. Boyd observed a strong bond between Kokel and T.D.B. and
testified that he has no objections to Kokel continuing a role in T.D.B.'s life. Boyd explained that
he is now estranged from Cindy. Because Kokel's visitation has been curtailed, Boyd has been
unable to interact with T.D.B.

 At the close of the evidence, the district judge observed:


First let me say that this is about the best interest of [T.D.B.]. . . . I do believe all the
parties, all the adult parties, love this child. I think that all the adults in this case have
flaws and there are facts and disputes regarding some of those allegations.


What's not in dispute is that none of these parties are--adult parties have physically
harmed this child nor is there any evidence that there's a high risk that they will, or
that there's a significant risk or even a moderate risk that they will. A number of the
experts have talked about best interest of the child being stability. I take this as
stability in placement, environment and parenting. I think what is evident is that Ms.
Hebert has changed her mind in her life more than once in ways that have directly
and adversely affected this child, including who is to be considered the father, as well
as whether a grandfather, her father, will have contact with the family.


Mr. Hebert, likewise, for one year and nine months decided and stuck with his
decision not to see, support or take responsibility for this child. The track record to
date is about one half of [T.D.B.]'s life. Mr. Hebert has been involved in about one
half. Mr. Kokel I do not see as having changed and made decisions with respect to
this child that have changed since he's been aware of the impending birth. That
includes through the changes that he did not make, including the wife's pregnancy
by another man, her return, her request that he act as the child's father, that she allow
him to be the primary or a primary caretaker for two years, and her decision then to
leave and marry the man who had fathered the child.


Now, Dr. Lewis has testified that she sees from what she can tell and was available
to her a volatile relationship. Other than that expert we had individual lay people
speak of a strong bond with Mr. Kokel. Dr. Lewis opined that Mr. Kokel may be the
stabilizer in this relationship. I think that that is what the evidence shows at this
point.


Addressing the Heberts, the judge expressed a lack of confidence that the Heberts would continue
to be together and would raise T.D.B. together, otherwise he "would consider weaning [T.D.B.]." 
He then appointed Kokel as a possessory conservator with limited visitation rights.

 There is sufficient competent evidence to support the district court's judgment, and
the district court did not err in appointing Kokel as a possessory conservator with limited visitation
rights. We overrule the Heberts' first point of error.

 In their second point of error, the Heberts contend that the district court erred in
imposing a geographic restriction on T.D.B. In its findings of fact, the court found that "temporary
restriction on the child's domicile to Travis County and counties contiguous to Travis County is
necessary and appropriate and would facilitate the parties' participation in family therapy and is in
the best interest of the child." Because the court's one-year restriction limiting the child's residence
to Travis County and contiguous counties expired on April 16, 2006, the issue is moot, and we will
not address it.


CONCLUSION

 Having overruled the Heberts' first point of error, we affirm the judgment of the
district court in all respects.


 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: August 11, 2006
1. In Troxel, the Supreme Court held a grandparent access statute to be unconstitutional on
the ground that it contravened the Due Process Clause of the Fourteenth Amendment to the United
States Constitution. Troxel v. Granville, 530 U.S. 57, 72 (2000). The Troxel case involved a lawsuit
of paternal grandparents to obtain visitation with their grandchildren after their son had died. Id. at
60-61. Section 153.433 of the Family Code allows grandparents, under particular circumstances,
to petition for access to a child, provided it is in the child's best interest. See Tex. Fam. Code Ann.
§ 153.433 (West Supp. 2005). The Heberts offer no other authority that supports their argument that
Troxel is relevant here. For this reason, Kokel argues that they have waived their argument. See
Tex. R. App. P. 38.1(h).